## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

VILIAM GORIAN,

     Plaintiff,

v.                                            Civ. No. 14-874 SCY

CAROLYN W. COLVIN,
*Commissioner of the*
*Social Security Administration*,

     Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Plaintiff Viliam Gorian's Motion to Reverse and Remand the Social Security Administration (SSA) Commissioner's decision to deny Plaintiff disability insurance benefits. ECF No. 15. Having considered the parties' briefing, the administrative record, the relevant law, and being otherwise fully advised, the Court finds Plaintiff's arguments in favor of reversal unpersuasive and will, therefore, **deny** Plaintiff's motion.

## I.   <span style="font-variant:small-caps">Background</span>

### A.  **Plaintiff's Medical History**

Plaintiff Viliam Gorian is a 55 year old man who alleges disability based on Hepatitis C, joint pain, chronic fatigue, depression, and anxiety. Administrative Record ("AR") 70. Plaintiff has suffered from Hepatitis C for over twenty years. AR 384.[1] Plaintiff also has Lyme disease, having tested positive for this disease in 2007. AR 379.

Plaintiff was first treated by Dr. Elizabeth DePirro Ward, M.D., on October 7, 2008. AR 296-98. Dr. Ward found that Plaintiff was emotionally labile, and that he had a history of

---

[1] Plaintiff's earliest blood test results in the record, from February 2008, show that Plaintiff had elevated liver enzymes and rheumatoid factor. AR 358-59.

Hepatitis C and Lyme disease. AR 296. Plaintiff again saw Dr. Ward on November 11, 2008 in connection with complaints of anxiety. AR 299-301. At that time, Dr. Ward noted that Plaintiff's psychiatric condition appeared normal. AR 300. Plaintiff reported that Lexapro, which he was taking for anxiety, was causing him joint pain. AR 299. When Dr. Ward saw Plaintiff on January 7, 2009, Plaintiff stated he had sleep disturbances; Dr. Ward diagnosed him with primary insomnia, noting that his anxiety appeared stable on Lexapro. AR 302-04. On March 12, 2009, Dr. Ward noted that Plaintiff appeared "poorly developed . . . poorly nourished . . . [and] distressed." AR 306. On May 27, 2009, Plaintiff was seen by Nora Sanchez, CFNP, and he reported weight loss, ostensibly due to greater activity levels, but increased fatigue due to his hepatitis. AR 310. On October 23, 2009, Plaintiff again saw Dr. Ward for a follow-up visit regarding his cirrhosis. During this visit, he reported worsening fatigue and significant back pain, as well as continuing anxiety and "brain fog." AR 311, 313, 417. An X-ray of his spine revealed no abnormalities. AR 313, 323.

Plaintiff also has a history of reported right shoulder pain. *See*, *e.g.*, AR 346-8, 360, 363, 380. Plaintiff received orthopedic treatment from Dr. Kevin McGee, M.D. AR 332. On January 7, 2011, Dr. McGee examined Plaintiff and diagnosed him with a sprain/strain and possibly a slap tear in his right shoulder, as well as subacromial impingement syndrome in both shoulders. AR 334-35. Dr. McGee treated the right shoulder with a subacromial steroid injection and recommended physical therapy. AR 332. At a follow-up appointment on February 17, 2011, Plaintiff reported that the subacromial steroid injection to his right shoulder had been very effective in easing his pain, and Dr. McGee observed that Plaintiff had full range of motion in both shoulders with normal rotator cuff strength. AR 332.

On October 27, 2011, Plaintiff was seen by Dr. Tamara Hudson, M.D. for a lesion on his head. AR 441. On December 6, 2011, Plaintiff again saw Dr. Hudson, who examined him and found that he had "osteoarthritis of multiple sites." AR 424. On January 5, 2012, Dr. Hudson treated Plaintiff for De Quervain's tenosynovitis in his right thumb. AR 426. On September 13, 2012, Plaintiff saw Dr. Hudson for back pain; on examination, Dr. Hudson noted that Plaintiff's lower back "exhibited tenderness on palpation of the left paraspinal region" and stated that she would treat the pain with a short steroid course that was usually helpful. AR 447-48.

In December 2011, Plaintiff received a mental disability evaluation from Amy DeBernardi, Psy.D.  AR 386-89. She noted that Plaintiff's general appearance was normal and he was cooperative, with no evidence of malingering or deceptive behavior. AR 387. Dr. DeBernardi diagnosed Plaintiff with depressive disorder and assessed him with a GAF score of 55, noting that his prognosis was fair and his depression was responsive to medical therapy. AR 389. With regard to his ability to function, she stated that "[t]he claimant struggles to manage frustration. This may interfere with his ability to take direction from a supervisor and interact appropriately with coworkers. He will likely have difficulty persisting through an average workday due to fatigue. He is also likely to experience challenges in an environment that requires physical activity." AR 389.

On January 10, 2012, Dr. Paul Cherry, Ph.D. performed a psychiatric review of Plaintiff, AR 390-98. He found that Plaintiff had depressive disorder NOS and anxiety, with mild difficulties in maintaining social functioning. AR 393-94, 398. This review was confirmed by Dr. Sadovnik on March 5, 2012. AR 74.

On January 7, 2012, Dr. Erika Garcia performed a disability determination examination on Plaintiff. AR 402-04. She noted that Plaintiff's extremities were largely normal, although

Plaintiff had decreased flexion in his right thumb and decreased range of motion on the right shoulder.  AR 404.  Specifically, she found "[o]n the right shoulder he had decreased abduction of about 40 degrees. He had a normal forward elevation, backward elevation, internal and external rotation. The left side was within normal limits." AR 404.

On January 20, 2012, Dr. Nancy Armstrong performed a physical residual functional capacity assessment and determined that Plaintiff "has a long history of intermittent, recurrent shoulder pain, with resultant mild functional limitations" finding that he could occasionally lift 50, and frequently lift 25 pounds, sit or stand for 6 hours in an 8 hour workday, and otherwise had no limitations, including manipulative limitations. AR 406-10.

On March 5, 2012, Dr. Jessy Sadovnik, Psy.D., performed a psychiatric residual functional capacity assessment of Plaintiff, finding that Plaintiff's mental health issues appeared to be related to his physical limitations and she affirmed Dr. Cherry's findings. AR 75-76.

On March 14, 2012, Dr. Allen Gelinas, M.D., provided a physical residual functional capacity assessment and opined that "[t]he [Claimant] appears capable of medium exertional work as indicated in the initial RFC with the added manipulative limitations indicated in RFC at recon[sideration]." AR 78. This additional manipulative limitations referred to Dr. Gelinas' finding that Plaintiff's ability to reach in any direction, including overhead, was limited to only frequently. AR 77.

**B.  Procedural History**

Plaintiff filed his Title II application for disability insurance benefits on October 7, 2011. AR 21. His claims were denied on January 20, 2012 and his request for reconsideration was denied on March 23, 2012. *Id*. Plaintiff requested a hearing on March 27, 2012. *Id*. A hearing was held on February 6, 2013. *Id*. The ALJ issued his decision denying Plaintiff's request for

4

benefits on June 3, 2013. AR 21-30. The Appeals Council denied Plaintiff's appeal of the ALJ's decision on July 24, 2014. AR 1.

## II.   APPLICABLE LAW

### A.  Disability Determination Process

A claimant is considered disabled for purposes of Social Security disability insurance benefits if that individual is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Commissioner has adopted a five-step sequential analysis to determine whether a person satisfies these statutory criteria. *See* 20 C.F.R. § 404.1520. The steps of the analysis are as follows:

(1) Claimant must establish that she is not currently engaged in "substantial gainful activity." If Claimant is so engaged, she is not disabled and the analysis stops.

(2) Claimant must establish that she has "a severe medically determinable physical or mental impairment . . . or combination of impairments" that has lasted for at least one year. If Claimant is not so impaired, she is not disabled and the analysis stops.

(3) If Claimant can establish that her impairment(s) are equivalent to a listed impairment that has already been determined to preclude substantial gainful activity, Claimant is presumed disabled and the analysis stops.

(4) If, however, Claimant's impairment(s) are not equivalent to a listed impairment, Claimant must establish that the impairment(s) prevent her from doing her "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. § 404.1545(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* § 404.1545(a)(3). Second, the ALJ determines the physical and mental demands of Claimant's past work. Third, the ALJ determines whether, given Claimant's RFC, claimant is capable of meeting those demands. A claimant who is capable of returning to past relevant work is not disabled and the analysis stops.

(5) At this point, the burden shifts to the Commissioner to show that Claimant is able to

"make an adjustment to other work." If the Commissioner is unable to make that showing, Claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 1520(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005).

### B. Standard of Review

A court must affirm the denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 800-01 (10th Cir. 1991). In making these determinations, the reviewing court "neither reweigh[s] the evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008). For example, a court's disagreement with a decision is immaterial to the substantial evidence analysis. A decision is supported by substantial evidence as long as it is supported by "relevant evidence . . . a reasonable mind might accept as adequate to support [the] conclusion." *Casias*, 933 F.3d at 800. While this requires more than a mere scintilla of evidence, *Casias*, 933 F.3d at 800, "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

Similarly, even if a court agrees with a decision to deny benefits, if the ALJ's reasons for the decision are improper or are not articulated with sufficient particularity to allow for judicial review, the court cannot affirm the decision as legally correct. *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). As a baseline, the ALJ must support his or her findings with specific weighing of the evidence and "the record must demonstrate that the ALJ considered all of the evidence." *Id.* at 1009-10. This does not mean that an ALJ must discuss every piece of evidence

in the record. But, it does require that the ALJ identify the evidence supporting the decision and discuss any probative and contradictory evidence that the ALJ is rejecting. *Id.* at 1010.

## III.    ANALYSIS

Plaintiff contends that the ALJ's RFC finding that Plaintiff was capable of medium work is not supported by substantial evidence. ECF No. 15 at 13-16. In particular, he argues that the ALJ failed to consider physical limitations in reaching, standing, and walking and the mental limitations identified by Dr. DeBernardi. ECF No. 15 at 19. Plaintiff also contends that the ALJ failed to sufficiently assess the duties of Plaintiff's past work. *Id.* Finally, Plaintiff asserts that, because the RFC is flawed, the ALJ's finding that Plaintiff could perform his past relevant work cannot stand. *Id.* The Commissioner responds that the ALJ reasonably found that Plaintiff was capable of performing medium work with a limitation only of frequent overhead reaching, that the ALJ generally made the proper findings with regard to Plaintiff's RFC, and that the ALJ correctly determined that Plaintiff could return to his past relevant work. ECF No. 19.

As explained more fully below, the Court finds that Plaintiff's arguments are not well-taken and that substantial evidence supports the ALJ's decision.

### A.    The ALJ Adequately Considered Plaintiff's Physical Limitations

The ALJ found that Plaintiff "has the residual functional capacity to perform medium work as defined in 20 CFR § 404.1567(c) except the claimant is limited to frequent overhead reaching with his dominant right hand and arm." AR 26. Thus, the ALJ determined that Plaintiff could perform the full range of light work, including "a good deal of walking or standing" as well as being able to "lift[] no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 CFR §§ 404.1567(b), (c). Plaintiff, however, points to two physical limitations that he contends were not properly accounted for in the RFC: his ability

7

to reach overhead, and his ability to stand or walk for six hours out of an eight hour day. ECF No. 15 at 14-16. Specifically, Plaintiff contends that the ALJ too heavily relied on Dr. Gelinas' opinion that Plaintiff could frequently reach overhead, and that the ALJ provided no evidentiary support for his finding regarding Plaintiff's ability to stand and walk. *Id.*

> i.  *Plaintiff's Reaching Limitation*

Plaintiff asserts that the ALJ's opinion regarding reaching limitations incorrectly rests on the findings of Dr. Gelinas which, Plaintiff argues, are inconsistent because Dr. Gelinas alternatively found Plaintiff capable of occasional and frequent overhead reaching. ECF No. 15 at 14, AR 74, 77. The Commissioner responds that the "occasional" limitation language is not actually part of Dr. Gelinas' opinion, noting that this part of the record is written by "by non-physician agency staff." ECF No. 19 at 7. The Court agrees with the Commissioner that the language found on page 74 of the administrative record appears to have been generated by someone other than Dr. Gelinas, as part of Plaintiff's Disability Determination Explanation file. AR 70-79. In his reply, Plaintiff shifts to arguing that this misquotation somehow triggers a due process right to review Dr. Gelinas' report. ECF No. 20 at 3, n.2. The Court disagrees. The case on which Plaintiff relies for that assertion, *Yount v. Barnhart*, 416 F.3d 1233, 1235 (10th Cir. 2005), involved the ALJ's consideration of a medical report produced post-hearing to which the claimant had no access and on which the ALJ predicated his decision. Here, Dr. Gelinas' report was produced a full year prior to the hearing, and there is no indication that Plaintiff did not have access to it or was prevented from responding to it. In fact, at the hearing, the ALJ directly referenced this report amongst the exhibits he entered into the record, and Plaintiff's attorney voiced no objection. AR 37-38. Therefore, the Court rejects Plaintiff's arguments that (1) Dr. Gelinas issued inconsistent opinions and the ALJ improperly relied on the part of the opinion

that supported him while ignoring the part that did not; and (2) Plaintiff has been denied the opportunity to review a medical report, in violation of his due process rights.

ii.   *Plaintiff's ability to stand and walk*

The ALJ determined that Plaintiff had the RFC to perform medium work, which means that Plaintiff could stand or walk for six out of eight hours in a day. 20 CFR 404.1567(c). Plaintiff alleges that the ALJ failed to support this finding with a narrative description of how he reached this conclusion, that this determination is not justified by the medical evidence in the record, and that the ALJ failed to discuss or develop contradictory evidence in the record. ECF No. 15 at 15. Specifically, Plaintiff points to two pieces of allegedly contradictory evidence: Plaintiff's elevated rheumatoid factor in a series of blood tests from 2008-2011 (AR 322, 359, 428), and Plaintiff's consistent complaints of back pain and fatigue, which are symptoms of Plaintiff's Hepatitis C (AR 42, 46, 48, 214-15, 218, 252, 303-04, 311, 447). ECF No. 15 at 15-16. The Commissioner responds that the reasons for the ALJ's findings are clear from the decision and that the ALJ had no duty to develop the already extensive record. ECF No. 19 at 6-7.

Plaintiff's argument that the blood tests results indicated a medical problem that the ALJ should have, but failed to consider is unsupported by the opinions of the doctors who reviewed Plaintiff's medical records. Plaintiff argues that these results demonstrate his rheumatoid factor was elevated to more than twice the normal limit – but he points to no medical statement in support of this conclusion. The Court is aware of no evidence in which any doctor made such a determination or flagged these blood test results as particularly alarming.[2] To the contrary, the only indication that any doctor expressed concern about these blood test results occurred in 2008, in which a handwritten notation on the blood test results states, "Overall WNL [within normal

---

[2] AR 322, however, does contain some illegible notes.

limits]. liver enzymes slight elevated. watch ETOH, limit tylenol, motrin. repeat in 3mo to verify." AR 358.

The ALJ explicitly discussed this record, noting that Plaintiff should limit use of Tylenol and Motrin and pointing out that "there was possible use of Ethyl Alcohol that would make the liver enzymes appear elevated." AR 27. The ALJ further noted that, "[o]n September 13, 2012, Tamara Hudson, M.D., wrote that a viral count was performed the previous year, and there was no need for yearly counts if the claimant was not considering treatment." *Id*. Nothing in the records Plaintiff cited, or in the records as a whole, substantiates Plaintiff's allegation that the ALJ should have done more to address Plaintiff's blood test results. To the contrary, the lack of any demonstrated concern about these results from any of the doctors that have reviewed Plaintiff's records indicates that, had the ALJ reached his own medical conclusions from these blood results, he would have been impermissibly substituting his judgment on medical matters for the judgment of medical professionals.

Similarly, the ALJ adequately discussed Plaintiff's complaints of back pain and fatigue. The ALJ accorded great weight to Dr. Gelinas' and Dr. Armstrong's opinions, wherein both determined that Plaintiff was capable of medium work. AR 28, 77-78, 406-10. In contrast, Plaintiff cites no medical opinion to support his position that he is incapable of performing medium work. Instead, as support for Plaintiff's claims of back pain and fatigue, Plaintiff primarily relies on his own self-serving statements. ECF No. 15 at 16.

The ALJ specifically addressed Plaintiff's allegations in his decision. After noting these allegations, he concluded, "the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations." AR 27. He further writes, "claimant's statements concerning the intensity, persistence, and limiting effects of these

symptoms are not entirely credible for the reasons explained in this decision." AR 28.  The ALJ noted that Plaintiff did not seek follow-up care related to hepatitis C and cirrhosis of the liver on a regular basis and that "objective medical evidence revealed that his symptoms were well controlled even without pharmaceutical intervention. Regarding claimant's joint pain, his prescription for Lexapro appeared to be keeping his symptoms under control. Although the claimant alleged the above symptoms, the objective medical evidence does not corroborate his allegations." AR 29. Thus, the ALJ repeatedly addressed and considered Plaintiff's allegations. As the trier of fact, the ALJ is the individual optimally positioned to observe and assess witness credibility. *Casias v., Secretary of Health & Human Svcs.*, 933 F.3d 799, 801 (10th Cir. 1991). This Court must accept "the nature and limits of its review," and not second-guess the ALJ by substituting its judgment for his. *White*, 287 F.3d at 909. The medical record with regard to Plaintiff's ability to stand and walk was adequately developed and the ALJ adequately considered and discussed this record.  Plaintiff has not met his "burden of proving his inability to return to his particular former job and to his former occupation as that occupation is generally performed throughout the national economy." *Andrade v. Sec. of Health & Human Svcs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).

### B.     The ALJ Adequately Considered Evidence of Plaintiff's Mental Limitations

Plaintiff next asserts that the ALJ failed to consider Dr. DeBernardi's assessment of Plaintiff's limitations and failed to further develop the record with regard to these limitations. ECF No. 15 at 19. Plaintiff specifically refers to Dr. DeBernardi's determination that Plaintiff had limitations in his ability to tolerate stress, take direction from a supervisor, interact appropriately with coworkers, persist through an average workday due to fatigue, perform in an environment that requires physical activity, and with his coping skills. ECF No. 15 at 19.

Contrary to Plaintiff's assertion, the Court finds that the ALJ extensively discussed Plaintiff's psychological and physical capabilities, including these alleged limitations. First, he discussed Plaintiff's activities of daily living, his social functioning, and his concentration, persistence and pace. AR 24. In doing so, he referred to state agency psychological consultants Paul Cherry, Ph.D. and Jessy Sadovnik, PsyD., who both indicated that Plaintiff had no limitations in the area of daily living, only mild limitations in the area of social functioning, and no limitations with regard to concentration, persistence, and pace. *Id*. The ALJ determined that these findings were consistent with the record as a whole. *Id*. The ALJ noted that, after reviewing the medical records, these doctors determined that Plaintiff's mental impairment was non-severe. *Id*. at 25. The ALJ granted great weight to these opinions. *Id*. He also found them consistent with the preponderance of credible evidence, including the psychological examination Plaintiff had with El Pueblo Family Healthcare.  *Id*.

The ALJ then specifically discussed Dr. DeBernardi's conclusions and ultimately assigned them little weight because they were inconsistent with other substantial medical records as well as Dr. DeBernardi's own notes during the consultative examination. *Id*. As set forth above, the ALJ also concluded that objective medical findings failed to support Plaintiff's assertions of fatigue and other physical limitations. *Id*. at 27. The Court, therefore, rejects Plaintiff's argument that the ALJ failed to discuss Dr. DeBernardi's limitations.[3]

Plaintiff also asserts that "[b]ecause ALJ Willner rejected this evidence [of limitations Dr. DeBernardi found], he was required to either ask Dr. DeBernardi for clarification, or order another consultative evaluation." ECF 15 at 19. In support of this argument, Plaintiff cites *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) and 20 C.F.R. § 404.1512(e).

---

[3] Plaintiff does not allege the ALJ committed error in assigning Dr. DeBernardi's opinion little weight.

Under this authority, an ALJ must "seek additional evidence or clarification from [a claimant's] medical source when the report from [a claimant's] medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Robinson*, 366 F.3d at 1084 (quoting 20 C.F.R. § 404.1512(e)(1) and 416.912(e)(1)). However, Plaintiff does not allege the existence of any of the conditions that would require the ALJ to seek additional evidence or clarification: a conflict or ambiguity that must be resolved, that the report does not contain all the necessary information, or that it is not based on medically acceptable clinical and laboratory diagnostic techniques. The ALJ gave the opinion of a non-treating doctor little weight based on conflicts between that opinion and other evidence on the record as well as conflicts between that opinion and the doctor's own notes. Nothing in *Robinson* requires an ALJ to obtain further information in this situation.

## C. In Concluding that Plaintiff Could Perform Past Relevant Work as an Elevator Inspector, the ALJ Committed No Error at Step Four, Phase Two

Plaintiff next argues that the ALJ failed to adequately consider the mental and physical demands of his past relevant work ("PRW"). ECF 15 at 4. At Step Four, Phase Two of the sequential analysis, an ALJ must make specific findings concerning the physical and mental demands of a claimant's past relevant work. *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). The ALJ began this task by asking Plaintiff questions about his PRW. Plaintiff advised the ALJ that performing the elevator repair job was very hard on his body and that the elevator inspector job was "much easier on [his] body." AR 52-53. When asked when he noticed a problem with the elevator inspection job, Plaintiff replied that "instead of doing the physical labor then it was more mind and paperwork, and I realized the mind is not as sharp as it used to

13

be either." AR 53. Plaintiff further advised that he had difficulty concentrating which impaired his ability to perform the elevator inspection job. AR 53 ("[i]t was like reading things over and over again and not really understanding what I was reading."). Plaintiff did not indicate that physical limitations made it difficult for him to perform the elevator inspector job.

The ALJ also obtained information from a vocational expert ("VE") about the duties of elevator repair person and elevator inspector as those positions are generally performed in the economy, with particular attention to Plaintiff's reaching restrictions. The VE provided the *Dictionary of Occupational Titles* ("*DOT*") numbers for each position, classified the job of elevator repair mechanic as medium exertional level with a specific vocational preparation ("SVP")[4] of 7 (skilled), and classified the job of elevator inspector as light exertional level with a SVP of 8 (skilled). The ALJ then asked whether a hypothetical individual "limited to only occasional overhead reaching with the dominant right hand and arm" could perform any of Plaintiff's PRW. AR 58. The VE responded in the negative and stated, "[m]y assumption is although the *DOT* does not specify that overhead reaching is part of the reaching at all [sic], I would say there would be a lot of overhead reaching with that type of mechanical position." AR 59. The ALJ then clarified that this statement related to work as an elevator repair person as opposed to work as an elevator inspector. AR 59. Next, with regard to the duties of an elevator inspector, the VE discussed those duties as set forth in the *DOT* and opined, "I would say that with that position even though listed as light, I would say the overhead could very well be frequent again for overhead." AR 59. Thus, the VE's description of elevator inspector duties

---

[4] SVP refers to the "time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." Dictionary of Occupational Titles, App. C, Sec. II (4th ed., revised 1991), 1991 WL 688702 (G.P.O.); *see also Vigil v. Colvin*, 805 F.3d 1199, 1201 n.2 (10th Cir. 2015).

14

contained a demand not explicitly set forth in the *DOT*, but that was relevant to Plaintiff's overhead reaching limitation. The Court concludes that the ALJ met his Phase Two burden of obtaining specific information about the mental and physical requirements of work as an elevator inspector.[5]

The only medically established limitations at issue in this Phase Two analysis are the ALJ's findings that Plaintiff can perform medium work except that he is limited to frequent overhead reaching with his dominant right hand and arm. *See Wells v. Colvin*, 727 F.3d 1061, 1075 (10th Cir. 2013) (constraining Phase Two analysis to medically established limitations in RFC). Thus, the ALJ needed only to obtain enough information regarding these limitations to determine whether Plaintiff could perform his PRW as an elevator inspector despite them. *Wells*, 727 F.3d at 1075. The VE advised the ALJ that work as an elevator inspector is a light exertional and skilled position. The Tenth Circuit's decision in *Wells* indicates that, by obtaining this information, the ALJ fulfilled his obligation at Phase Two. *See id.* ("[t]he ALJ questioned the VE concerning the bookkeeper job, and was told that it was a 'sedentary skilled occupation' at level six. Thus, the ALJ had sufficient information regarding the demands of Ms. Wells' bookkeeping job relevant to his RFC assessment, which included the full range of either light or sedentary work and featured no other specific mental or postural limitations. Furthermore, the ALJ made a sufficient finding concerning this issue when he stated that '[t]he claimant's past work of bookkeeper . . . [was] sedentary in exertional level." (internal citations omitted)).

Here, the ALJ obtained more than just information about Plaintiff's exertional level, however. The ALJ also relied on the *DOT* description of the position. "It is well established that

---

[5] The Court need not decide whether the ALJ erred at Step Four, Phase Two of his analysis related to whether Plaintiff could perform his PRW as an elevator repair person.  This is because, regardless of whether he erred at Phase Two, he committed error at Phase Three of his analysis related to the job of elevator repair person.  Because Plaintiff could perform his PRW as an elevator inspector even if he could not perform his PRW as an elevator repair person, however, this error is harmless.

'the agency accepts the [definitions in the *Dictionary of Occupational Titles*] as reliable evidence at step four of the functional demands and job duties of a claimant's past job as it is usually performed in the national economy." *Bowman v. Astrue*, 511 F.3d 1270, 1273 n.1 (10th Cir. 2008). *Bowman* involved a claimant with limited use of her left hand and whose PRW all required frequent or constant "seizing, holding, grasping, turning, or otherwise working with hand or hands." *Id.* at 1273 (internal quotations and citations omitted). The ALJ in *Bowman* committed error by relying on the *DOT* Codes for the claimant's prior jobs without asking "the VE to give an opinion concerning whether Ms. Bowman's limited use of her left hand would affect her ability to perform the required handling activities." *Id.* The ALJ in the present case, however, did what the ALJ in *Bowman* did not. Rather than just relying on the *DOT* description of an elevator inspector's duties, the ALJ had the VE discuss how Plaintiff's reaching limitation would affect his ability to work as an elevator inspector. Thus, *Bowman* lends support to the Commissioner's argument that the ALJ committed no error at Phase Two.

Similarly, the vocational expert in *Doyal*:

testified that the claimant's past relevant work as a housecleaner and sewing machine operator would be classified as light and unskilled, and her past relevant work as an activities director would be classified as light and semiskilled . . . . The vocational expert indicated that the claimant's past relevant work as a housecleaner and sewing machine operator did not require lifting more than 20 pounds, walking for prolonged periods, or performing tasks requiring bilateral normal grip strength.

*Doyal*, 331 F.3d at 760 (internal citations and quotations omitted). The Tenth Circuit determined that the ALJ's reliance on this information was sufficient to meet the requirements at Phase Two. *Id.* at 761. Specifically, the Tenth Circuit determined "[t]he ALJ did not delegate the analysis to the vocational expert; instead, he quoted the VE's testimony approvingly, in support of his own findings at phases two and three of the analysis. There was nothing improper about this. An "ALJ may rely on information supplied by the VE at step four." *Id.* at 761.

Given that the ALJ's actions in the present case were similar to the actions of the ALJ in *Doyal*, *Doyal* also lends support to the Commissioner's argument that the ALJ committed no error at Phase Two.

Also providing support is the Tenth Circuit's decision in *Andrade*, where an ALJ used the *DOT* to determine that the claimant's PRW should be categorized as light even though the claimant's testimony regarding how he actually performed his work indicated a higher exertional rating. *Andrade v. Sec. of Health & Human Svcs.*, 985 F.2d 1045, 1050-51 (10th Cir. 1993). The Tenth Circuit recognized that an "ALJ may rely on the [*DOT*'s] job description for claimant's job category as presumptively applicable to a claimant's prior work." *Id.* at 1051. The Tenth Circuit then determined that, even if the claimant could not return to his past work as actually performed, the claimant failed to meet his burden "to demonstrate he cannot return to his former type of work, and not just to his previous job." *Id.* at 1052.

Unpublished Tenth Circuit cases lend further support to the notion that an ALJ's reliance on the *DOT*'s description of PRW or a VE's description of the exertional and skill level of PRW is sufficient to meet the ALJ's burden at Phase Two. *See Bales v. Colvin*, 576 F. App'x 792, 799-800 (10th Cir. 2014) (ALJ's notation of claimant's past jobs as unskilled positions performed at the light exertional level combined with VE's response to hypothetical questions sufficient to support finding that claimant able to perform her PRW as actually performed); *Best-Willie v. Colvin*, 514 F. App'x 728, 738 (10th Cir. 2013) (VE's testimony regarding exertional and skill levels of PRW and the ALJ's reliance on *DOT* descriptions of PRW supported finding that the "ALJ obtained information concerning the physical and mental demands of [claimant's] past relevant work and appropriately relied on the vocational expert's testimony in her decision."); *Zaricor-Ritchie v. Astrue*, 452 F. App'x 817, 825 (10th Cir. 2011)

(given definition of "unskilled job," VE's testimony that dishwasher was an unskilled job provided ALJ with sufficient information regarding mental demands of claimant's PRW as a dishwasher to determine that claimant could perform job in spite of mental limitations imposed by RFC); *But see Sissom v. Colvin*, 512 F. App'x 762, 769 (10th Cir. 2013) (reiteration of VE testimony regarding exertional and skill level of PRW insufficient to determine work demands of claimant's PRW). Plaintiff specifically cites to the Tenth Circuit's unpublished decision in *Villalobos v. Colvin*, 544 F. App'x 793 (10th Cir. 2013). The *Villalobos* opinion, however, does not indicate that the ALJ there relied on a *DOT* description of the PRW or on VE testimony regarding the exertional or skill level associated with the PRW. Further, the lack of detailed analysis in the brief one paragraph the Tenth Circuit devotes to the PRW issue limits the persuasive value of the opinion.

In the present case, the Court does not have to determine the minimum information that the ALJ needed to meet his burden at Phase Two. The ALJ had testimony from the VE about the exertional and skill level of an elevator operator, a description from the *DOT* of the physical and mental demands required of an elevator inspector, testimony from the VE about the effect Plaintiff's reaching limitations would have on his work as an elevator inspector, and testimony from Plaintiff indicating that physical issues with his PRW were alleviated when he switched from working as an elevator repair person to working as an elevator inspector. By obtaining this information, the ALJ met his burden of determining the mental and physical demands associated with the position of an elevator inspector.

**D.**     **The ALJ Committed No Error at Step Four, Phase Three of His Analysis With Regard to the Elevator Inspector Position and His Error With Regard to the Elevator Repair Position Was Harmless**

At Step Four, Phase Three, an ALJ must determine whether a claimant can meet the demands of his PRW despite his impairments. *Winfrey*, 92 F.3d at 1024-25. Plaintiff argues that, to the extent the ALJ compared his RFC "with the functions required of an elevator repair person and an elevator inspector, that he did so in his head *without making specific findings*." ECF 15 at 18 (emphasis in original). The Court determines that the ALJ failed to make adequate findings on the record to support his conclusion that Plaintiff could perform his PRW as an elevator repair person. The ALJ did, however, adequately consider and explain his conclusion that Plaintiff could perform his PRW as an elevator inspector.  The Court further concludes that, in light of the ALJ's legally sufficient conclusion that Plaintiff could perform his PRW as an elevator inspector, the ALJ's legally insufficient conclusion that Plaintiff could perform his PRW as an elevator repair person is harmless.

At the February 6, 2013 hearing in this matter, the ALJ posed a number of hypothetical questions to the VE involving individuals with various limitations. At no point did the VE advise the ALJ that any of these hypothetical individuals could meet the demands of an elevator repair position. Nonetheless, without explanation, the ALJ determined that Plaintiff could perform his PRW as an elevator repair person. AR 29. The ALJ's failure to evaluate, or at least to articulate his evaluation, that Plaintiff could perform his PRW as an elevator repair person constitutes error. *See Winfrey,* 92 F.3d at 1025 (stating that the ALJ must evaluate a claimant's ability to meet demands of PRW and noting that "[r]equiring the ALJ to make specific findings on the record at each phase of the step four analysis provides for meaningful judicial review.").

However, with regard to the elevator inspection job, the ALJ first asked the VE whether a hypothetical individual who is limited to only occasional overhead reaching with the dominant right hand arm could perform any of Plaintiff's PRW. AR 58. The VE advised that the

hypothetical individual with Plaintiff's limitations could not perform the job of elevator inspector because such a job could involve frequent overhead reaching. AR 59. The ALJ later changed this hypothetical to describe an individual limited to frequent overhead reaching. AR 62. The VE advised that, with the modification of frequent overhead reaching, the hypothetical individual could perform the elevator inspection position. AR 62. The ALJ then added light exertional work to the hypothetical and the VE again advised that the hypothetical person could perform the job of elevator inspector. AR 62. While "[i]t is improper for an ALJ to make RFC findings and then to delegate the remaining phases of the step four analysis to the vocational expert," the ALJ "may rely on information supplied by the VE at step four." *Doyal*, 331 F.3d at 761. In obtaining this testimony from the VE, relying on it, and referencing information in the *DOT* about this position (including SVP and exertional levels), the ALJ adequately performed the analysis required at Step Two, Phase Three. Further, a "claimant bears the burden of proving his inability to return to his particular former job and to his former occupation as that occupation is generally performed throughout the national economy." *Andrade v. Sec. of Health & Human Svcs.*, 985 F.2d 1045, 1051 (10th Cir. 1993). The record demonstrates that Plaintiff failed to meet his burden at Phase Three with regard to the elevator inspector position.

The Court now turns to the issue of whether the ALJ's error in concluding that Plaintiff could return to his PRW as an elevator repair person was harmless. Although unpublished, the Tenth Circuit issued a decision persuasive to the resolution of this question in *Martinez v. Astrue*, 316 F. App'x. 819 (10th Cir. 2009). There, at Step 4, an ALJ determined that a claimant could perform her PRW as a customer service representative. *Id.* at 822. The ALJ further determined at Step 5 that claimant could perform other jobs that exist in significant numbers in the national economy. *Id*. The Tenth Circuit determined that the ALJ failed to make sufficient findings

regarding the physical and mental demands of the claimant's PRW and, therefore, erred at Step 4 in concluding that the claimant could perform her PRW as a customer service representative. *Id.* at 824. Nonetheless, the Tenth Circuit concluded that this error was harmless in light of the ALJ's proper finding that there were other jobs the claimant could perform. *Id.* Similarly, even though the ALJ in the present case erred in finding that Plaintiff could perform his PRW as an elevator repair person, this error is harmless because the ALJ properly concluded that Plaintiff can perform alternate work as an elevator inspector.

**IV.   CONCLUSION**

For the reasons set forth in this Opinion, the Court finds that the ALJ committed no error in arriving at Plaintiff's residual functional capacity, in determining the physical and mental demands associated with Plaintiff's past relevant work as an elevator inspector, or in determining whether Plaintiff could meet the demands of his past relevant work as an elevator inspector. With regard to Plaintiff's past relevant work as an elevator repair person, the Court concludes that the ALJ failed to make adequate findings on the record to support his conclusion that Plaintiff could perform his past relevant work as an elevator repair person. This error, however, is harmless.

As a result, the ALJ's decision to deny Plaintiff disability insurance benefits is **AFFIRMED**.

**IT IS SO ORDERED.**

UNITED STATES MAGISTRATE JUDGE
**Presiding by Consent**